# Hornsby v. Commonwealth.

June 13, 1947.

Rehearing denied November 18, 1947.

W. J. Baxter, Judge.

Shumate & Shumate for appellant.

Eldon S. Dummit, Attorney General, and H. K. Spear, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

At his trial in the Madison circuit court, under an indictment charging him and others with murdering Ikey Davis Jones, appellant was convicted of voluntary manslaughter with an attached punishment of imprisonment in the penitentiary for ten years. His motion for a new trial was overruled and from the judgment of the court he prosecutes this appeal.

The motion for a new trial relied on nine alleged errors as sufficiently prejudicial to authorize this court to reverse the judgment, but four of them are abandoned by appellant's counsel in their brief filed on this appeal,

since they present and argue only five grounds. Two of them (the first and second) are directed to the insufficiency of the evidence to authorize a submission of appellant's guilt to the jury and to sustain its verdict finding him guilty, and the court erred in not sustaining his motion for a peremptory acquittal.

The third ground argued by counsel is incompetent evidence admitted over appellant's objections and refusal to permit competent evidence offered by him. The fourth ground complains of prejudicial statements and conduct of the witness, Hallie Horn, and also improper argument and statements during the trial of prosecuting counsel. The fifth and last ground presented by counsel in their brief is error of the court in giving a manslaughter instruction.

The contention of the insufficiency of the evidence to sustain the conviction, and the consequent error of the court in overruling appellant's motion for a directed acquittal, will first be disposed of. The homicide occurred in a section of the city of Richmond where disorderly conduct and law violations appear to be prevalent, a part of which consisted of rendezvous for law violators, within which illegal sales of liquor were made. Between 3 and 4 P. M. on May 12, 1946, the deceased, Davis Jones, who resided at Berea, Kentucky, and Herschell Johnson, who was the circuit court clerk of Jackson County, met in Richmond. Some time later they obtained some liquor which they imbibed and, perhaps, replenished it upon available occasions up to the time of the killing of Jones which occurred between 1 and 1:30 A. M. on May 13. Some hour or so before the killing Robert C. Long, a resident of Richmond joined the two, and the trio went in search of more liquor. The three then engaged in scouring the portion of the city above described and had visited some of the known bootlegging joints therein. But the extent of their success is not disclosed.

One of the streets in the described section is Orange Street which runs east and west, with no sidewalks on either side. Appellant's residence faces on that street on its south side, its front being near the curb of the street, and all others on that side are constructed close together. Immediately west of appellant's residence (3

or 4 feet) is one occupied by the prosecuting witness, Hallie Horn, and her son, which she had occupied some two years or more. She was therefore well acquainted with appellant and his wife, even to the extent of being familiar with the voices of each. She is a colored woman, and it was proven that at least 50% of the population of the area referred to is of that race.

At the time of the homicide the trio, consisting of the deceased, Johnson and Long, was traveling west on Orange Street engaged in singing and exclaiming "hello." As they passed appellant's residence, according to the testimony of both Johnson and Long, Mrs. Hornsby was standing in the door, or perhaps on a small front porch and said to them, "You boys had better get on up the street." Immediately before the shooting the witness, Hallie Horn, testified, she heard appellant say to his wife, "May, May, I want the gun," and immediately two shots were fired which she said were from the direction of defendant's house, the last one of which was the fatal one. Both Johnson and Long testified that the two shots were fired when they and the deceased were about 20 or 25 feet from the front of appellant's residence, and that they were confident from the sound that they came from appellant's residence, though neither of them saw the flash of the gun. They were to some extent corroborated in that statement by the witness, Hallie Horn. Johnson and Long, when the deceased fell from the effects of the fatal shot, immediately ran west on Orange Street, but separated at the next intersection, one of them going one way and the other in the opposite direction. Johnson never returned, but finally made his way back to his home at McKee, in Jackson County. Long did return, but in the meantime a truck driver passed by and saw the body of the deceased lying in the street, and he described the surrounding situation. While that witness was still at the scene Long returned and decedent's body was finally taken care of.

Appellant and his wife both denied the testimony of the three prosecuting witnesses referred to, but they each testified that some hour or more before the fatal shooting there were other shots from a larger caliber gun than the one firing the fatal shot, it being a 22 caliber as shown from the bullet extracted from the body of

deceased. It was proven, and admitted by defendant, that he had in his residence at the time a 22 rifle, and it, as well as the bullet that killed decedent, was sent to a ballistic expert who made and returned to the authorities in Richmond a report which was offered by the Commonwealth, but was excluded by the court on objection by defense counsel on the ground that the one who made it was the proper one to testify concerning what the test revealed, and its accuracy. The Commonwealth did not incorporate it by way of avowal, and we do not know what it contained, except what might be inferred from the objections made to its introduction by appellant's counsel.

Defendant claims to have been asleep at the time of the firing of the first of the last two shots above referred to, and that he was awakened by the first one, but heard the last and fatal one. He testified that he went to the door and saw the body of deceased lying in the street and, later went to it, where a crowd soon gathered and he then returned to his residence. It appears from the evidence that when the louder shot from a larger caliber gun was fired, some hour or so before the fatal one was fired of a smaller caliber, some commotion was created in the immediate vicinity concerning it in which appellant participated.

The witness, Long, in giving his account of the homicide was asked:

"Q. Any doubt in your mind about where those shots came from? A. No sir.

"Q. Now, if there had been some shots from other houses over there that would have been possible, but these came from the Hornsby house? A. Yes sir."

He also testified that neither member of the trio was armed. A detailed recitation of the entire testimony heard at the trial has a tendency to strengthen the conclusion that appellant fired the shot resulting in the death of Jones, but we have concluded for the sake of brevity not to pursue a further discussion of the testimony, since we are convinced that what we have rehearsed authorized the submission of the appellant's guilt to the jury and to sustain their verdict so finding.

All persons possess five senses through and by

which they may ascertain facts. The location of where a noise emanates is ascertainable by two of them—sight and hearing. When they are in normal condition the one is about as accurate as the other as to the information they each convey, especially so if the one hearing the sound is near the place where it is produced and which is shown to be the situation in this case. The two prosecuting witnesses testified that they were confident as to the place from whence the fatal shot was fired. Neither of them knew the appellant at that time, though they afterwards learned that the house from which the fatal shot was fired from the 22 rifle was the one occupied by appellant and his wife. We would be compelled to discard, in toto, such testimony given by those disinterested witnesses as corroborated by the witness, Horn, and to accept the testimony of appellant and his wife, each of whom was deeply interested in the issue to be determined. We are convinced that the rules of practice do not require that we should do so. Rather do we conclude that the testimony of the prosecuting witnesses referred to justified the action of the court in overruling appellant's motion for a peremptory acquittal. Therefore the argument of counsel so far discussed is overruled.

We have searched the record and find nothing therein sustaining ground (3) discussed by counsel, unless it be some statements made by counsel and by the witness, Hallie Horn, during her examination. The witness, who, as we have said, was a colored woman, appeared to be frightened and hesitated to testify as to the statement which she eventually gave, disclosing the request of appellant to his wife to give him his gun, which occurred, according to the witness, immediately before the firing of the fatal shot. When she so hesitated, counsel insisted that she tell what she heard appellant say to his wife on that occasion, and said, in substance: "You appear to be frightened, but go ahead and answer the question. The court and the officers will protect you." After repeated warnings of the court of the punishment he would be compelled to inflict upon her unless she answered the questions, she finally did so and told it as hereinbefore stated. In the meantime, and while prosecuting counsel was examining the witness, attorneys for defendant were constantly objecting and more or less vociferously

propounded questions to the witness tending to excite and confuse her, when prosecuting counsel—either at that time or in his closing argument—stated that defending counsel appeared to be pursuing their course for the purpose of confusing the witness, whereupon defense counsel moved to discharge the jury and continue the case, but which the court overruled.

We fail to see any reversible error in the court's action in overruling that motion, either as based on remarks of prosecuting counsel, or because the witness became confused and frightened causing the hesitancy she displayed. She, it will be remembered, was a witness for the Commonwealth and if she acted in a manner to discredit her testimony it would appear to redound to the benefit of appellant rather than against him. Other minor, and what we conclude immaterial, testimony offered by the Commonwealth is also relied on, but all of which are obviously nonprejudicial.

Jury trials of cases, both criminal and civil, are conducted by a presiding officer called the Judge, and by the jury impaneled to determine the facts from the testimony adduced. Neither are infallible and because of which slight departures from the blueprinted rules of practice for the trial of cases occur in practically every trial conducted by the court. If new trials should be granted for every such departure, then practically every appeal brought to this court would have to be reversed. Therefore, the familiar code rule, as prescribed in secs. 134 of the Civil Code of Practice and 340 of the Criminal Code of Practice, to the effect that a reversal will not be ordered, except for errors prejudicial to the substantial rights of the applicant therefor, were enacted. The first one says:

"* * * The court must, in every stage of an action, disregard any error or defect in the proceedings, which does not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect."

The second one prescribes that:

"A judgment of conviction shall be reversed for any error of law (appearing on the record when, upon consideration of the whole case, the court is satisfied

that the substantial rights of the defendant have been prejudiced thereby.)''

The fifth ground urged by counsel for a reversal, i. e., that a voluntary manslaughter instruction should not be given, is unsustainable and without merit. We are aware that this court in many cases has held that the giving of such an instruction in a homicide case when the only evidence showed that the defendant was guilty of premeditated murder, if guilty at all, was error authorizing a reversal of a verdict finding the defendant guilty of only voluntary manslaughter, and that he had not committed wilful murder. But this record does not meet the requirements of that rule. The deceased and his companions were producing considerable disturbance so as to cause appellant's wife—according to prosecuting witnesses—to request that they pass on up the street. That, with other disturbances of meandering crowds in that vicinity both on that occasion and others, was no doubt enough to anger the appellant and to generate "sudden heat and passion" so as, in our opinion, to reduce the degree of his crime from wilful murder to voluntary manslaughter. The court therefore did not commit error in giving the manslaughter instruction.

We have carefully read this record twice, together with the labored arguments of defending counsel, but viewing the evidence as a whole, we have concluded that no sufficient ground for reversing the judgment is shown.

Wherefore, for the reasons stated, the judgment is affirmed.